

# NUMBER 13-16-00547-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JOSEPH DELMARCO CARTER,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

### On appeal from the 19th District Court
### of McLennan County, Texas.

---

## MEMORANDUM OPINION[1]

### Before Justices Rodriguez, Contreras, and Benavides
### Memorandum Opinion by Justice Rodriguez

Appellant Joseph Delmarco Carter challenges his conviction for indecency with a

child by contact, a second-degree felony, and his three convictions for aggravated sexual

---

[1] This case is before this Court on transfer from the Tenth Court of Appeals in Waco pursuant to an order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2017 1st C.S.). Because this is a transfer case, we apply precedent of the Tenth Court of Appeals to the extent it differs from our own. *See* TEX. R. APP. P. 41.3.

assault of a child, first-degree felonies.[2]  *See* TEX. PENAL CODE ANN. §§ 21.11(a)(1), (d),

22.021(a), (e) (West, Westlaw through 2017 1st C.S.).  The jury found Carter guilty of

each offense and assessed punishment at twenty years' imprisonment for the indecency

charge and ninety-nine years' imprisonment for each of the aggravated sexual assault

charges, with the sentences to run concurrently.  He was also assessed court costs of

$784.  By seven issues, Carter complains that:  (1) the trial court abused its discretion

in denying his motion for mistrial; (2–3) the court abused its discretion when it admitted

extraneous-offense evidence; (4) the evidence is insufficient to prove that he committed

the charged offenses; and (5–7) the trial court erred in imposing court costs.  We affirm

as modified.

## I. DENIAL OF MISTRIAL

By his first issue, Carter contends that the trial court abused its discretion when it

denied his motion for mistrial.  He sought a mistrial on the basis that complainant K.B.'s

outburst interfered with the jury verdict.[3]  The State responds that, based on the record,

it cannot be shown that the trial court abused its discretion in denying a mistrial.  We

agree with the State.

## A.    Relevant Background[4]

---

[2] The trial court entered four judgments against Carter in Case No. 2015-1015-C1, one for each conviction.  Carter challenges the four judgments in one appeal, No. 13-16-00547-CR.

[3] We use initials for the complainant and family members to protect any minors' identities.  *See* TEX. R. APP. P. 9.9 cmt. ("The rule [protecting the privacy for filed documents in civil cases] does not limit an appellate court's authority to disguise parties' identities in appropriate circumstances in other cases."); *Salazar v. State*, ___ S.W.3d ___ , ___, No. 13-17-00579-CR, 2018 WL 3655572, at *1 n.1 (Tex. App.— Corpus Christi Aug. 2, 2018, no pet.).

[4] Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it.  *See* TEX. R. APP. P. 47.4.

When the State called K.B. to testify, crying was heard outside the courtroom door. The court immediately granted the parties' request to meet in chambers to discuss what had happened. In chambers, the State explained that when the courtroom door was opened for K.B. to enter from the hallway, K.B. saw Carter and started crying and hyperventilating. According to the State, K.B. was "very, very emotionally kind of hysterical after seeing [Carter] when the door was open." The court recalled that earlier testimony revealed K.B. had not seen Carter since the offense allegedly occurred. Carter's counsel claimed that the jury "all heard it." He asked for a mistrial because he "believe[d] the jury ha[d] been prejudiced."

The trial court responded, "I'm not sure what the jury heard. I could hear her crying. I was at the bench, and the jury was in the box. I could hear her crying. I couldn't distinguish what she was saying." The prosecutor proffered that she was in the hallway with K.B., and she

> could not understand what [K.B.] was saying except for one point in time she said, "PawPaw, PawPaw, PawPaw, PawPaw," asking for her grandfather who was standing behind her, and that was actually the only auditory thing that I could make out except for, "He's staring at me; he's staring at me" and "PawPaw," and I was standing right in front of her.

While in chambers, the parties discussed the possibility of having Carter sit in a different location in the courtroom during K.B.'s testimony and how that relocation would impact his right to confront this witness. The trial court also commented that "the tight rope we're walking is that [K.B.] may do something that would cause a mistrial with [Carter] being here . . . . I know we're all in a hard position . . . . Oh, it's not [to the level of a mistrial], no."

During this discussion in chambers, the jury retired from the courtroom. When the

3

jury returned approximately one hour after the outburst, the State called K.B. without further incident. And, as agreed in chambers, Carter remained in the courtroom during K.B.'s testimony, but he was seated at the rear of the courtroom in the bailiff's station and out of K.B.'s line of sight.

At the end of the State's case and with no jury present, Carter re-urged his motion for mistrial. He called Felipe Martinez to testify in support of his motion. Attorney Martinez explained that he helped with Carter's legal defense and was in the courtroom the day that the outburst occurred. Martinez described what he heard as "screaming and—and crying." Someone yelled in the hallway "loud enough to hear in the inside of the courtroom." According to Martinez, he heard someone yell that "she couldn't face him." He testified that from the reactions outside "it was emotional for her."[5] After hearing this testimony and the arguments of counsel the trial court denied Carter's re-urged motion.

After the jury found Carter guilty and assessed his punishment, Carter filed a motion for new trial renewing his motion-for-mistrial argument—that K.B.'s "dramatic and loud" outburst interfered with the jury's verdict. He offered the affidavit of attorney David Bass in support of his motion. Bass, who was attending a hearing in a nearby courtroom, described the outburst as follows:

> Despite [closed courtroom doors], I and those around me suddenly were interrupted by a loud and sustained wailing emanating from the shared

---

[5] While agreeing that K.B. was not the only cause for this delay, Martinez's testimony suggested that Carter's trial should have begun that day at 8:30 a.m. and because of the outburst, K.B. did not testify until two hours later—about 10:15 a.m. However, during this hearing, defense counsel agreed with the trial court that the outburst occurred only one hour before K.B. began her testimony and during that hour technical issues were also resolved. Now on appeal, Carter notes that "the other arrangements [for his placement in the court room during K.B.'s testimony] were explored only because of the outburst."

corridor of the courthouse. . . . I could not understand any of the words that were being uttered by [sic] I certainly heard a very loud cry of anguish. It went on for what seemed like a considerable time.

The commotion was so loud and the intensity of the anguish was so pronounced inside the 54th District Court that everyone around me stopped what they were doing and looked up. Everything ceased until the cries and shouting stopped.

After admitting Bass's affidavit, the trial court again denied Carter's motion.

## B.     Standard of Review and Applicable Law

We review the denial of a motion for mistrial under an abuse of discretion. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). We must uphold the ruling if it is within the zone of reasonable disagreement. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). An outburst from a witness that interferes with normal trial proceedings will not result in reversible error unless the defendant shows that a reasonable probability exists that the conduct interfered with the jury's verdict. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). Injury to a defendant is measured on a case-by-case basis. *Landry v. State*, 706 S.W.2d 105, 112 (Tex. Crim. App. 1985) (en banc).

## C.     Discussion

Carter argued before the trial court and now on appeal that K.B.'s "hysterical" verbal outburst was likely heard and understood by the jury, halted proceedings in other areas of the courthouse, and caused undue delay in the trial. For these reasons, Carter contends a reasonable probability exists that K.B.'s outburst interfered with the jury's verdict, and thus, the trial court abused its discretion when it denied his motions for

5

mistrial.[6]   We disagree.

The record reflects that on the morning of the third day of trial there was an outburst in the hallway outside the courtroom door.   The State described the outburst as hysterical, emotional crying and screaming, while the defense described the outburst as hysterical.   Our review of the record reveals that only a few words from the outburst were distinguishable.   The prosecutor who was leaving the courtroom to meet K.B. and was standing in front of her, heard "PawPaw" and "he's staring at me."   An assisting defense attorney in the courtroom heard that she "couldn't face him."   Although the outburst was verbal, the trial court presiding over Carter's trial heard crying but no words and was unsure what the jury heard.   Finally, an attorney from a nearby courtroom explained that proceedings there were halted by a loud, anguished wailing.

However, even if the jury heard crying as the trial court heard or the few words others heard and even if proceedings in another courtroom were halted because of the loud, emotional outburst, there is no indication in the record that the jury saw complainant-witness K.B. in the hallway or was otherwise made aware of the source of the outburst.

---

[6] On appeal, Carter identifies other reasons for why K.B.'s outburst likely interfered with the jury's verdict:   (1) K.B. was not a bystander but a complainant witness; (2) the verbal and non-verbal outburst affected her credibility, suggesting to the jury that she was upset because Carter had done the things she claimed; (3) the outburst occurred during the guilt-innocence phase, giving rise to a greater potential for prejudice; and (4) the trial court's response was inadequate.   However, on appeal, we consider only those arguments that were before the trial court at the time of the ruling regarding the outburst.   *See Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)).   These reasons for why K.B.'s outburst likely interfered with the verdict were not before the trial court when it ruled on Carter's motions for mistrial, so we do not reach them on appeal.   We "may not fault the trial court on the basis of arguments not presented to the trial court."   *Wead*, 129 S.W.3d at 129.

Carter also asserts that the outburst had an inflammatory effect which was intensified by the "relative weakness of the State's case."   This argument was not before the trial court and so is not before us on appeal.   *See Ocon*, 284 S.W.3d at 884; *Wead*, 129 S.W.3d at 129.   But to the extent it challenges the sufficiency of the evidence, we address it in Carter's fourth issue.

*Cf. Stahl v. State*, 749 S.W.2d 826, 829 (Tex. Crim. App. 1988) (en banc) (op. on reh'g) (considering whether the person who made the outburst was a witness or a bystander and the impact on the jury); *Landry*, 706 S.W.2d at 111–12 (considering whether the outburst was verbal or non-verbal and the impact on the jury); *cf. also Robinson v. State*, No. AP-76,535, 2013 WL 2424133, at *2–7 (Tex. Crim. App. June 5, 2013) (not designated for publication) (analyzing a court room spectator outburst); *Sparks v. State*, No. AP-76,099, 2010 WL 4132769, at *20 (Tex. Crim. App. Oct. 20, 2010) (not designated for publication) (reviewing a trial spectator's non-verbal response). There is no record to establish that the jury was otherwise aware of the source of the outburst or how it related to the case. In other words, there is simply nothing in the record to support a conclusion that this outburst interfered with the jury verdict on this basis, as Carter urges. *See Coble*, 330 S.W.3d at 292.

Carter also argues that K.B.'s outburst caused undue delay in the trial, interfering with the jury's verdict and prejudicing Carter. It is undisputed that the outburst resulted in a delay in the proceedings, but the delay lasted only an hour during which time technical problems were also corrected. When the outburst occurred, the trial court immediately adjourned to chambers with Carter and all counsel where they discussed the outburst and how best to handle K.B.'s testimony and Carter's right to confront this witness by being present in the courtroom during her testimony. During this discussion, the jury retired from the courtroom and was not brought back until K.B. was ready to testify. *See, e.g., Landry*, 706 S.W.2d at 111–12. No other outbursts occurred. No jury instruction was requested. *See id.*; *see also Coble*, 330 S.W.3d at 292 (setting out that in the context of outbursts, a trial court's instruction to disregard is generally considered

7

sufficient to cure any impropriety because it is presumed that the jury will follow the instruction). Measuring any injury to Carter on a case-by-case basis, *see Landry*, 706 S.W.2d at 112, we cannot conclude that Carter has demonstrated how any delay in the trial established a reasonable probability that the outburst interfered with the jury's verdict. *See Coble*, 330 S.W.3d at 292.

Finally, Carter claims that K.B.'s outburst was significantly more inflammatory than any of the following cases where outbursts did not require reversal:

> • In *Robinson*, the victim's son-in-law "started screaming profanities at Appellant" and ran toward him "in an obvious attempt to assault Appellant." Several officers had to restrain and remove him from courtroom. However, the trial court took several actions to minimize prejudice and assure the jury was not adversely impacted. *See Robinson*, 2013 WL 2424133, at *6–7.
>
> • In *Coble*, the victim's sister exclaimed, "I hate you for making me go through this again and my kids. You're mean." The victim's cousin later "burst out, 'Evil piece of shit!'" These outbursts occurred at punishment and appeared to require only brief recesses. *See Coble*, 330 S.W.3d at 291.
>
> • In *Landry*, the decedent's wife "was in the process of fainting" during defense closing argument. His brother declared "[h]e had been waiting nine long months for this." Although the jury was excused, it appears there was only a brief recess. *See Landry*, 706 S.W.2d at 111–12.

However, unlike these cases, the outburst was not witnessed within the courtroom, the source of the outburst was not specifically known to the jury, and the content of K.B.'s statements were not wholly intelligible to those within the courtroom. These points of distinction suggest that K.B.'s outburst was less inflammatory than those in the cases cited by Carter, not more so. Any comparison with these cases only favors the conclusion that the trial court did not reversibly err in denying a mistrial.

Carter has not shown a reasonable probability that K.B.'s outburst interfered with

8

the jury's verdict. *See Coble*, 330 S.W.3d at 292. Because the trial court's denial of Carter's motions for mistrial was within the zone of reasonable disagreement, it did not constitute an abuse of discretion. *See Ocon*, 284 S.W.3d at 884; *Ladd*, 3 S.W.3d at 567. We overrule Carter's first issue.

## II. EXTRANEOUS-OFFENSE EVIDENCE

By his second and third issues, Carter challenges the admission of extraneous-offense evidence. He claims lack of notice and prejudice by the respective issues.

### A. Article 38.37—Notice

In his second issue, Carter contends that the trial court abused its discretion when it admitted extraneous-offense evidence regarding "three distinct periods of time when [Carter] allegedly touched [K.B.'s] breast." He claims error on the basis that this evidence was not included in the State's article 38.37 notice.[7] *See* TEX. CODE CRIM. PROC. art. 38.37, § 3 (West, Westlaw through 2017 1st C.S.). Carter contends that he "was completely in the dark about K.B.'s allegations of these extraneous offenses because the prosecutor deliberately withheld them from the discovery furnished to the defense." He contends that his attorneys were "forced to think on their feet, and basically, defend by reaction." We disagree.

### 1. Applicable Law

---

[7] Carter also complains that the trial court abused its discretion when it allowed the State, without article 38.37 notice, to introduce extraneous-offense evidence that involved similar events that occurred while the family lived in another state. However, Carter did not object at trial to the State's failure to notice this testimony, and so he has not preserved this complaint for our review. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008) ("A timely and specific objection is required to preserve error for appeal."); *see also Gallo v. State* 239 S.W.3d 757, 768 (Tex. Crim. App. 2007) (providing that appellate arguments must correspond with the objection at trial).

Section 3 of article 38.37 of the Texas Code of Criminal Procedure requires the State to "give the defendant notice of the state's intent to introduce in the case in chief evidence described by Section 1 or 2 not later than the 30th day before the date of the defendant's trial." *Id.* Section 1(b)(2) of this article permits the introduction of extraneous-offense evidence as relevant to "the previous and subsequent relationship between the defendant and the child." *Id.* art. 38.37, § 1(b)(2). The purpose of this notice requirement is to prevent surprise and inform the defendant of the extraneous offenses or acts the State plans to introduce at trial so that he can mount an effective defense. *Lara v. State*, 513 S.W.3d 135, 143 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see Price v. State*, 245 S.W.3d 532, 539 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

"Error in admitting evidence in violation of the notice provision of Article 38.37 is non-constitutional error." *Lara*, 513 S.W.3d at 142–43; *see Woods v. State*, 152 S.W.3d 105, 118 (Tex. Crim. App. 2004) (en banc). We analyze such error for harm under Texas Rule of Appellate Procedure 44.2(b). *See* TEX. R. APP. P. 44.2(b). Rule 44.2(b) provides that "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." *Id.* A substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Simpson v. State*, 119 S.W.3d 262, 266 (Tex. Crim. App. 2003).

### 2.    Discussion

On May 6, 2015, Carter was indicted on three counts of aggravated sexual assault of a child and four counts of indecency with a child by contact. The indecency counts involved the same sexual contact—touching the child's breast—but on different dates.

On July 19, 2016, immediately before trial began, the State waived the July 8, 2014, May 8, 2014, and March 8, 2014 indecency counts. The State retained the fourth indecency count that alleged the same behavior occurred on September 8, 2014.

It is undisputed that the State did not provide Carter with article 38.37 notice of its intent to offer evidence regarding the incidents that occurred in July, May, and March 2014. Because the complained-of incidents were not included in the State's article 38.37 notice, we will assume without deciding that the trial court erred by admitting such evidence in violation of the notice provision of article 38.37, and we will proceed with a harm analysis.

Prior to trial, Carter had notice, through the indictment, of four counts of indecency with a child by contact and of the allegations K.B. made against him related to the four counts. At the pretrial hearing, the trial court heard the State's motion to waive three indecency counts. Defense counsel offered the following response:

> Your Honor, much like the defense is allowed ten days when the State tries to amend the Indictment, that's what they're doing here. I'm pretty sure the evidence is going to show that there was never any touching of the breasts on the dates alleged, and it casts doubt on the State's case for them to abandon—for them to leave those in, and they've had them there since, I guess, whatever the date of the Indictment was, May 2015. This is what we've prepared on, and we object.

The trial court granted the State's motion and voir dire began.

The record fairly reflects that defense counsel was prepared to defend this case based on an indictment that included four counts of indecency with a child, all of which involved the same sexual contact but on different dates. *See Baez v. State*, 486 S.W.3d 592, 601–02 (Tex. App.—San Antonio 2015, pet. ref'd) (*cert. denied*, 137 S.Ct. 303 (2016) (concluding error, if any, in denying a continuance for lack of article 38.37 notice was

11

harmless because the defendant was prepared to defend the case based on the indictment, although the State had waived some counts before trial and the complainants from those counts would testify). Although three counts were waived and not prosecuted by the State, defense counsel acknowledged that Carter was prepared to proceed on all counts. Carter never asserted that he was surprised by the challenged evidence. *See Lara*, 513 S.W.3d at 143. He did not request a continuance. And he does not assert how his trial strategy would have been different had the notice been made under article 38.37, rather than through the indictment. *See id.*

Based on the above, we cannot conclude that any error had a substantial and injurious effect or influence in determining the jury's verdict. *See Simpson*, 119 S.W.3d at 266. Because any error in the admission of the complained-of evidence did not affect Carter's substantial rights, we must disregard it. *See* TEX. R. APP. P. 44.2(b). We overrule Carter's second issue.

## B. Rule 403—Prejudice

In his third issue, Carter contends that the trial court abused its discretion in overruling his rule 403 prejudice objection to extraneous-offense testimony. *See* TEX. R. EVID. 403. He asserts that "[t]he complained-of evidence certainly posed at least a tendency to arouse the jurors' hostility toward [Carter] and their sympathy toward [K.B.'s sister] D.G. and K.B."

### 1. Applicable Law and Standard of Review

Under rule 403, a court may exclude evidence if the danger of unfair prejudice substantially outweighs the probative value of the evidence. *Id.*; *Greer v. State*, 436 S.W.3d 1, 9 (Tex. App.—Waco 2014, no pet.); *see also Perez v. State*, No. 10-16-00029-

CR, 2016 WL 7436632, at *2–3 (Tex. App.—Waco 2016, pet. ref'd) (mem. op., not designated for publication).   Rule 403 favors admission of relevant evidence and carries with it a presumption that relevant evidence will be more probative than prejudicial.   *Allen v. State*, 108 S.W.3d 281, 284 (Tex. Crim. App. 2003) (en banc); *Jones v. State*, 944 S.W.2d 642, 652–53 (Tex. Crim. App. 1996).   In considering a rule 403 objection, the trial court must balance the following:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

The trial court has broad discretion in conducting a rule 403 balancing test, and we will not lightly disturb the court's decision.   *Allen*, 108 S.W.3d at 284; *Greer*, 436 S.W.3d at 9.   All testimony will likely be prejudicial to one party or the other.   *Jones*, 944 S.W.2d at 653.   It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that rule 403 is applicable.   *Id.*

### 2.     Testimony

#### a.     K.B.'s Mother

During Carter's cross-examination of K.B.'s mother, the following exchange occurred regarding her understanding of the relationship between Carter and her other daughter, D.G.:

> Q.     Tell me about [D.G.'s] relationship with [Carter].   She doesn't really like him, does she?

13

A.     She did.    She was real close with him.

Q.     Was she close with him when he called the cops on her for getting into it with you?

     [THE STATE]:      Objection, relevance, Your Honor.

     [THE DEFENSE]:    It's directly related to their relationship, Your Honor, and [D.G.'s] bias and motivation for testifying.

     THE COURT:      I'll overrule the objection.

Q.     They had conflicts, didn't they?

A.     Excuse me?

Q.     [D.G.] and [Carter] had conflicts, didn't they?

A.     Yes.

Q.     And sometimes those conflicts involved the law enforcement officers coming out, didn't they?

A.     Yes.

Q.     Okay, and that was on more than one occasion, wasn't it?

A.     Yes.

### 2.    K.B.'s Sister

During direct examination of D.G., the State asked D.G. if Carter had ever done anything to her to make her feel uncomfortable. Carter objected on relevancy grounds and "under 404 and 403." The State responded that Carter "opened the door as to the relationship between [D.G.] and [Carter on his] cross-examination of [the girls'] mother." After the State established that the incident about which D.G. would testify occurred before "what happened to [K.B.]," the trial court overruled Carter's objection.

D.G. testified that she and two others were in her mother's apartment. D.G.

explained that while she was lying on the floor, eating "Hot Fries,"

> [Carter] had came [sic] out of the room or whatever. He was talking to us for a long time. He was just kind of saying . . . "Give me some of those Hot Fries," and I was like, "No, you go get your own," and then whenever I was still laying on my back with my legs up [and bent], he was like, "If you don't give me them Hot Fries, I'm going to come between your legs[.]"

### 3.    Discussion

As part of his defense, Carter attempted to show, through the mother's testimony, that there were conflicts between Carter and D.G.—to show D.G.'s bias and motivation for testifying to the extent she might have fabricated her testimony.[8] Later, D.G. was permitted to provide the complained-of testimony about an extraneous act, which was relevant to show a very different source of conflict between Carter and D.G. Clearly Carter opened the door to this testimony through the cross-examination of her mother. While there was a risk that D.G.'s testimony would generate an emotional response, the evidence went directly to supporting conflicts that were present between Carter and D.G. *See id.* The State needed the testimony to make Carter's defensive theory of fabrication less plausible. *See id.* And the presentation of the evidence did not consume an inordinate amount of time or repeat evidence already admitted. *See id.*

Based on our review of the record, the trial court, after balancing the various rule 403 factors set out above, could have reasonably concluded that the probative value of D.G.'s testimony was not substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403; *Greer*, 436 S.W.3d at 9; *see also Perez*, 2016 WL 7436632, at *2–3. We cannot conclude that a clear disparity existed between the degree of prejudice of

---

[8] D.G. testified at trial that she saw Carter having sex with K.B. on the night in question.

15

the offered evidence and its probative value.  *See Jones*, 944 S.W.2d at 653.  The trial court did not abuse its discretion in allowing D.G.'s testimony.  *See id.*; *see also* TEX. R. EVID. 403.  We overrule Carter's third issue.

### III.  SUFFICIENCY OF THE EVIDENCE

In his fourth issue, Carter contends that the evidence is factually insufficient to prove that he committed the offenses alleged.  He argues that "[t]he State's evidence was plagued by irreconcilable discrepancies among witnesses, irreconcilable inconsistencies in the complainant's various versions of what happened, demonstrable falsehoods, a lack of physical evidence and practical improbabilities that collectively render the evidence factually insufficient."  Carter acknowledges that the court of criminal appeals eliminated appellate review for factual sufficiency, but he nonetheless urges this Court to conduct such a review.[9]  *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.).

The court of criminal appeals has previously rejected opportunities to reinstate factual sufficiency review.  *Martinez v. State*, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010) (adopting the *Brooks* plurality as a unanimous majority view); *see Edwards v. State*, 497 S.W.3d 147, 156–57 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (rejecting a contention that a factual-sufficiency review should be reinstated in criminal appeals); *see also Garcia v. State*, No. 10-16-00045-CR, 2017 WL 124163, at *2 & n.2 (Tex. App.—Waco Jan. 11, 2017, pet. ref'd) (mem. op., not designated for publication) (similar).  As an intermediate appellate court, we are required to follow binding precedent in cases

---

[9] By his argument, Carter concedes that the evidence is legally sufficient to support his convictions.

decided by the court of criminal appeals. *State v. DeLay*, 208 S.W.3d 603, 607 (Tex. App.—Austin 2006), *aff'd sub nom.*, *State v. Colyandro*, 233 S.W.3d 870, 871 (Tex. Crim. App. 2007). This Court is bound by that precedent, and we decline Carter's invitation to disregard it.

## IV. COURT COSTS

### A. Constitutionality of Court Costs Assessed Against Carter

In his fifth issue, Carter complains that the trial court erred when it assessed court costs of $784 against him, even though he was an indigent criminal defendant. By his sixth issue, Carter challenges the constitutionality of statutes that authorize the assessment of court costs against such defendants because they violate the right to equal protection. He notes that court costs are not assessed against indigent civil parties and argues that equal protection requires similar treatment of indigent criminal defendants. *See Campbell v. Wilder*, 487 S.W.3d 146, 152 (Tex. 2016) ("It is an abuse of discretion for any judge, including a family law judge, to order costs [whether or not there is] an uncontested affidavit of indigence.").

The Waco court of appeals has discussed this argument on numerous occasions, for example, in *Martinez v. State* and *Perez v. State*. *See Martinez v. State*, 507 S.W.3d 914, 916–18 (Tex. App.—Waco 2016, no pet.) (holding that the assessment of court costs against indigent criminal defendants but not against indigent civil litigants is not an equal-protection violation because they are not similarly situated—(1) indigent criminal defendants are not prevented from access to courts but instead are afforded a number of advantages that are unavailable to indigent civil litigants and (2) the non-punitive recoupment of costs of judicial resources expended in connection with the trial of the case

17

constitutes a rational basis for different treatment); *see also Perez v. State*, No. 10-16-00029-CR, 2016 WL 7436632, at *3 (Tex. App.—Waco Dec. 21, 2016, pet. ref'd) (mem. op., not designated for publication) (same). For the reasons expressed in *Martinez* and *Perez*, we overrule Carter's fifth and sixth issues.

## B. Excessive Court Costs Assessed

By his last issue, Carter complains that the trial court miscalculated his court costs. He claims that the assessment of $784 in court costs reflects a double charge for the arrest fees. We agree.

Texas Code of Criminal Procedure article 102.011(a) authorizes a $50 fee for executing or processing an arrest warrant, a $10 fee for taking and approving a bond, and a $5 fee for commitment or release. TEX. CODE CRIM. PROC. ANN. art. 102.011(a)(2), (5), (6) (West, Westlaw through 2017 1st C.S.). These arrest fees total $65. *See id.* "An officer may not impose a cost for a service not performed or for a service for which a cost is not expressly provided by law." *Id.* art. 103.002 (West, Westlaw through 2017 1st C.S.).

The State argues that because the heading of the May 6 indictment shows "Booking #: 940348," there was a pre-indictment arrest. The State claims that the bill of costs accurately reflects that Carter was arrested twice on the underlying charges, once pursuant to a warrant and once pursuant to a capias—thus arrest fees of $130 were correct. We disagree.

The record reveals that the date of the indictment was May 6, 2015. The record also reflects that on May 6, 2015, a capias was issued in conjunction with the return of that indictment and that service was on May 7, 2015. Article 102.011 fees for those

18

arrest services total $65.  *See id.*  Other than the booking number on the indictment, there is no support in the record for the State's argument that there were two arrests that warranted the double fees assessed.  The record supports the assessment of fees for only one arrest.  Because an officer may not impose a cost for a service not performed, we must modify the fees assessed.  See *id.*

We sustain Carter's seventh issue.  The order to withdraw funds, attached to the trial court's judgments in trial court case number 2015-1015-C1, is modified to reduce assessed court costs by $65 and to reflect total court costs incurred of $719.

## V.  CONCLUSION

We affirm as modified.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 20th
day of September, 2018.

19